Totten J.,
delivered the opinion of the court.
The action is of assumpsit, in the circuit court of Davidson county, by the Bank of Tennessee, against Johnson and Hamilton, as endorsers of two bills of exchange, dated 5th April, 1848, for $5,100 each, the one payable at eight, the other at twelve months after date. These bills appear to be drawn by Cornelius Connor, on Pickett, Perkins & Co., at New Orleans, without acceptance; they were made payable to Jesse Johnson, who is the first endorser, and Andrew Hamilton is the last endorser. The case was tried at the May term, 1851, of the circuit court, when the jury found the issue in favor of the defendant, Johnson, and against the defendant, Hamilton. The plaintiff moved for a new trial as to Johnson, and the motion was overruled; the defendant Plamilton moved for a new trial, and his motion was likewise overruled, and judgment rendered against him for $11,748 81, the amount due on the bills; and there was judgment also for defendant Johnson, that he go hence, &c., whereupon a bill of exceptions was taken, and the plaintiff has appealed in error from the judgment in favor of said Johnson; and the said Hamilton has appealed in error from the judgment against him.
1st. We will consider the case as it relates to the defendant, J. Johnson. It appears that C. Connor was indebted to the Bank of Tennessee, at Nashville, for loans, as follows: a bill for $3,500, due 6th January, 1848; a bill for $3,200, due 6th February, 1848; a bill for $3,500, due 3d March, 1848; and a note for $2,000, due in May, 1848; of these bills and note the said Connor was drawer, and Pilcher & Porterfield were his *227 accommodation endorsers. We may observe here, that these bills and note were not met at maturity, but all went to protest. The President and Directors of the Bank were advised that Pilcher & Porterfield did not intend to aid in a renewal of this paper by a renewal of their endorsement for said Connor, and that they were anxious to be released from their existing liability.
The witness Wharton states, that sometime before the 10th January, 1848, he was requested by Connor to attest the signature of Jesse Johnson, as endorser, on the two bills now in question; that Johnson could not write, but made his mark, the name being written by Connor, and witness attested the act. He does not know whether the bills were filled or in blank, as he did not see the face of them.
Dr. Waters, a director of the Bank states, that in May, 1848, at a meeting of the board of directors, he was informed that Connor had offered Jesse Johnson, as endorser; a few days after this, when witness saw Jesse Johnson, he asked him if he would endorse Connor’s bills; Johnson replied that he would not endorse any bills for Connor. At a subsequent meeting of the board, witness informed them of what Johnson had said. Nichol, a director, stated to witness, that Johnson had already endorsed for Connor, that he had seen the paper; and when witness again saw Johnson, he, witness, expressed his surprise that Johnson had endorsed Connor’s bills, after what he had said at the former interview. Johnson replied, “No, I have endorsed no bills, and will not.” He stated that he had become Connor’s surety on some notes for a house and lot, in Southfield, Nashville, which Connor had bought of Playes, and that the notes were secured by alien on the property; and then said to the director: “I don’t want 'the Bank to take any bills with my name on them.” Before the bills were discounted, witness advised the board of this interview with Johnson, and what he had said. Witness had not seen *228 the bills, and was not then aware of their actual existence. It appears from a title bond in the record, that Hayes had agreed to convey a lot of land to the use of Connor’s wife and children, on payment of the purchase money. Connor was in doubtful circumstances, and the Bank was anxious to secure his suspended debt. They did not immediately resolve to take the new bills offered by Connor, with Johnson and Hamilton’s endorsement. The President, Mr. Ledbetter, says that Johnson was represented at the time, as owning property in Nashville, worth more than the debt; that he had conversations with Mr. Shapard, a director, the father-in-law of Por-terfield, who was of opinion that Johnson’s endorsement was better than that of Pilcher & Porterfield; and Dr. Waters says, that Mr. Shapard was anxious to have the arrangement effected, stating further that the means of P. & P. were limited. The bills remained in Bank from May, 1848, until 24th August, 1848, when the board concluded to accept them. On this day, when the bills were produced before the board, they were accompanied by a proposition that they would pay in cash on the debt $3,500, and if that were not accepted, that they would quit business. The board were advised of Johnson’s statement to Dr. Waters, then present, that he had endorsed notes for Connor for another purpose; that he had endorsed no bills for him — 'and that he did not wish the Bank to take any bills with his name upon them; this matter was considered by the board, and “the decision was that a written notice should have been given.”
It seems that the bills were twice rejected, but were finally accepted and ordered to be discounted. They were discounted on the 20th August, as before stated, but do not appear in the discount books until the 29th August, as entries of that description were made only once a week. The proceeds of the bills, and the $3,500 in cash, advanced by Pilcher and Por-terfield, extinguished the liability before stated of said Con- *229 nor to the Bank, and left a balance, which was credited on one of the bills. The Cashier, according to the usage of that Bank, checked for the proceeds, in the name of Andrew Hamilton, the last endorser, of which fact, it seems, Hamilton was not advised at the time. Johnson and Hamilton were merely accommodation endorsers, and were so regarded by the Bank, when the paper was accepted. It further appears, that after the discount was ordered, Dr. Waters, in going from the Bank, met Jesse Johnson, and informed him of what had been done. He still protested that he had endorsed no bills for Connor, and said he was ruined. Dr. Waters advised him “to go to the Bank before the bills were entered, and tell the President not to enter them.?’ He went in the direction of the Bank.
The President says, “I did not know Jesse Johnson, when the bills were discounted. My recollection is, that he called at the Bank, sometime afterwards and had a conversation with me on the subject, in which he stated, that he thought he was endorsing notes for Major Connor, and not bills, but said nothing about the proceeds goings to Connor’s credit.” These are all the facts deemed material to be stated.
It is argued by the counsel for Johnson, that it is a just and reasonable inference from the proof, that Connor, the drawer, practiced a fraud upon Johnson, in procuring his endorsement, by applying it to a different purpose, from that which was expressed and intended; and that the Bank was so advised before its acceptance of the bills. If this were so, the Bank would be a mala fide holder of the bills, and not entitled to recover. It is a question of fact, and it was submitted to the jury, under instructions from the court, which we deem very favorable to the Bank, and to which it certainly can take no just conception.
But it is insisted for the Bank, that there is no proof that ' such fraud was in point of fact perpetrated by Connor upon *230 Johnson, and that the fact must appear by competent proof, before the notice thereof, given by Johnson to the Bank, can avail him in his defence. On this point, the court instructed the jury, “that the declaration of Johnson is not competent evidence of his giving notice of such fact. The fact itself must be shown by other evidence.” Under such instructions, it is not probable that the jury have placed too high an estimate upon the evidence bearing upon this point. It is likely that Connor was the only person who could have stated distinctly what did occur when Johnson’s endorsement was procured. He was not examined as a witness. There are, however, facts and circumstances in the case, tending pretty strongly to the conclusion that Johnson was deceived, and that his endorsements were misapplied. And to these we may add, that the case itself affords intrinsic evidence tending, in some degree, to the same conclusion. It seems to háve been known that Connor was embarrassed. The board of directors was very much concerned for the safety of the debt — the debt was a large one, probably nearly as much as Johnson was worth — he was an illiterate man, could not write his name, and it may be inferred, was unskilled and uninformed in the nature and character of commercial and bank paper. The paper remained an unusual length of time in the possession of the Bank before it was accepted, probably some six weeks.
Pilcher and Porterfield, alarmed for their safety, had resolved to force the Bank to an adjustment on their own terms, or to close business and give up their credit. Johnson had notified the Bank, through the agency of one of its directors, not to discount any bills with his name upon them. Upon the day the bills were discounted, the directors hesitated, and once or twice rejected the bills, before they resolved to accept them — thus showing by their own conduct, in view of facts and circumstances known to them, and of which we have, *231 perhaps, an imperfect view, that they themselves doubted the propriety and justice of the act that they were about to perform. And yet, they made no enquiry of Johnson or of the witness who attested his signature, as to the facts under which his signature was obtained, or whether after the lapse of so long and unusual a time, in such transaction, he was still willing to abide his endorsement, in perhaps, the much changed and ruinous circumstances of Connor.
We cannot doubt, from the evidence in the case, that the President and Directors in the Bank were advised of the failing circumstances of Connor. Now, regarding Johnson as a person of ordinary prudence and intelligence, could they reasonably believe that he was still willing after so great a length of time, to abide the consequences of his endorsement, for a failing debtor to the Bank, to an amount nearly equal to his, Johnson’s entire estate?
In the next place, it is insisted for Johnson, that in point of fact, he revoked and recalled his endorsements before the Bank accepted and discounted the bills. On the contrary, it is argued for the Bank, that having endorsed the bills, and they having been afterwards endorsed by Andrew Hamilton, the last endorser to the Bank, Johnson had no right or power to revoke and recall his endorsements.
In the Planters' Bank vs. Galloway, 11 Humph. R., 343, the theory and nature of a bill of exchange are thus stated: “The drawer having funds in the hands of the drawee, assigns the same to the payee of the bill; if the drawee accept, it is an agreement on his part to pay the funds to the payee, or to such person as may become the holder of the bill. The acceptor is primarily and ultimately liable on the bill to every other party, the endorser, the payee, or drawer; that is, he is regarded as the principal debtor, and the other parties as his sureties, that if he do not pay the bill at maturity, they will pay it for him. Now where the bill is not accepted, which is *232 the present case, the drawer occupies the position of the acceptor, in all these respects. The bill itself imports a consideration to have been given at each negotiation of it, and the holder is presumed to be prima facie, a holder for value, Story on Bills, § 198. And the general rule is, that a Iona fide holder for value, is not affected by reason of any fraud, want of consideration, or other defect or infirmity, in the bill, as between the antecedent parties, of which he had no notice at the time he became such holder, Story on Bills, § 188. It is no objection to the title of the holder, that he knew it to be an accommodation bill, if he take it for value, Iona fide, before it has become due; for the parties to an accommodation bill are bound to a hona fide holder for value to the same extent as if that value had been advanced to them, Story on Bills § 191; Chitty on Bills, 80, (margin.)
But an accommodation bill, until it has passed into the hands of a holder for value, has no force or effect. As between the parties to such bill, no action will lie, for it confers no rights and imposes no obligations. There is no consideration upon which any right could be predicated, or any duty imposed. We have seen that if such bill be negotiated for value, the case is entirely changed, and the value paid by the holder imposes a duty on every party for accommodation, in the same manner as if he, himself, had received such value. See cases cited in Story on Bills, § 187; Chitty on Bills, 70 and 305, (margin,) and cases there cited.
If this be the true doctrine, it must necessarily follow that until an accommodation bill be negotiated for value, it is a mere voluntary and gratuitous proposition, and has not the force and effect of a valid and existing contract, such as, in point of form, it would seem to imply. Thus, in Downs vs. Richardson, 5 Barnwell & Alderson, 674, the court say, that “when an accommodation bill has the names of the different parties written upon it, it is in some sense of the word, a bill *233 of exchange; but it is utterly unavailable as a security for money, until it is issued to some real holder for a valuable consideration.”
Regarding an accommodation bill as a voluntary and gratuitous proposition, the conclusion is inevitable, that until it be negotiated and value be given for it, it may be recalled and revoked by any person, so far as relates to himself, who is a party merely for accommodation. Dogan vs. Dubois, 2 Richardson’s Eq. R., (S. C.,) 85; Marvin vs. McCollum, 20 Johns. R., 288; Skelding vs. Warren, 15 Johns. R., 272.
Mr. Chitty in his work on Bills, says that “although a drawer has written his acceptance on the bill, with the intent so accept the same, he may before he has communicated such fact to the holder, and parted with the bill, change his mind, and obliterate his acceptance, and thereby relieve himself from liability.” But this he could not do after he had induced the holder to take the bill on the credit of his acceptance.” Chitty on bills, 309.
And so, an endorsement, like an acceptance before it has been delivered to a bona fide holder, for value, may be revoked, Chitty on Bills, 243, margin; Cox vs Troy, 5 Barn. & Ald., 474; 1 Dow & Ry., 38.
Now to apply these principles to the present case. Johnson stated to Dr. Waters, a director, that he had endorsed no bills for Connor, and that he would not, and that he did not wish the Bank to take any bills with his name upon them. He further explained that he had endorsed notes for a different purpose, and which were secured by a lien upon the lots of land for which they were given. We have seen that this communication was made to the board of directors at the Bank, before the bills were discounted, and that the board came to the conclusion, that the notice should have been in writing. The substance of Johnson’s statement is simply this: “I endorsed notes for Connor, which are otherwise secured, but *234 have endorsed no bills for him, and will not; but if he has misapplied that endorsement, and it appears upon bills to be discounted for his credit in bank, in the manner you state, then I do not wish the Bank to discount the bills with my name upon them. We can but regard it as a direct and imperative revocation of the endorsement, accompanied by the further impressive circumstance, as stated by the endorser, that it had been improperly and unjustly obtained. But certainly it was not necessary that he assign any reason for recalling and receding from his endorsement; it was voluntary and gratuitous, and by his mere will he might revoke it. It follows, that in legal effect, when the Bank accepted and discounted the bill, Johnson was not then an endorser, or responsible as endorser, because before that time, and before any rights became vested in the Bank,’he had recalled and revoked his endorsement. The verdict in favor of Johnson was therefore correct.
In the next place, as to Andrew Hamilton: We do not think that the case shows a revocation as to him. It is true, that he did not wish to endorse for Connor, and after he had endorsed, desired the Bank as a matter of favor, not to discount the paper. But he could not decline Connor’s application, and it is to be inferred, that if Connor insisted upon his endorsement that he would continue and remain as his endorser, however unwillingly.
But Hamilton had no knowledge or information, as we in. fer from the record, that Johnson had recalled and receded from his endorsement. We are to presume that he endorsed upon the credit of all the antecedent parties to the bill, upon whom he was entitled, by his position on the bill, to recourse for his indemnity. But Johnson had ceased to be a party bound on the bill, and this fact was made known to the Bank, as we have seen, and not communicated to Hamilton. Can it be supposed that Hamilton would have consented to remain *235 on the bill, as endorser, if this material fact had been made known to him? Certainly not; and as the Bank accepted the .bill, with a full knowledge of the facts, we cannot regard it in any other light than as a mala fide holder of the bill, as relates to this endorser. If this were not so, and Hamilton were made liable to the Bank, then he should be entitled to his recourse upon Johnson for indemnity. But Johnson having revoked his endorsement, had ceased to be a party to the bill before the Bank became entitled to it, and consequently before the Bank became entitled to Hamilton’s endorsement. Johnson’s revocation was effectual to release him entirely from any responsibility upon the bill. He was not liable to the Bank, and he could not be liable to Hamilton; for such a position would imply only a mere circuity of action, and Johnson’s revocation would be a mere idle and unmeaning ceremony. We think that the true principle is, that in the circumstances of this case, the Bank is to be regarded as a mala file holder of the bill, as to any parties subsequent to Johnson, and who would otherwise have been entitled to indemnity from him. It seems to us, that to hold the contrary doctrine would be in effect, to deny to an endorser the right and power to recede from a voluntary and gratuitous endorsement; and we have seen that this right is well grounded both in reason and authority.
The case of the Union Bank vs. Osborne, 4 Humph. R., 416, was, as we think, correctly decided upon the principal question made in the case; Osborne the last endorser, had notice at the time of his endorsement, of the defect in the prior endorsement. In the present case there was no such notice.
We are of opinion, therefore, that the judgment be affirmed as to Johnson, and reversed as to Hamilton, and as to him the cause will be remanded for further proceedings.