No. 13,328.

Mrs. Harriet C. Marler, Widow, and Mrs. Harriett C. Marler, Tutrix, vs. The Texas and Pacific Railway Company.

### Syllabus.

Where the *res gestae* in an action for damages for personal injuries are the facts and circumstances under which the plaintiff left a car of the defendant company, his declarations relative thereto, not made spontaneously and instinctively under the immediate pressure of the occurrence, but deliberately in answer to questions as to how the accident occurred, propounded to him, out of the presence of any one who was an actor in the transaction and a considerable time after it had become an accomplished fact, and the conductor and his train were miles away, are not admissible in evidence as part of such *res gestae*.

Such declarations are not rendered admissible neither by the fact that they were made under a sense of impending death or by the fact that they may have been made to the physician called in to minister to him.

A PPEAL from the Tenth Judicial District, Parish of Rapides. Hunter J.

*John C. Blackman* and *Horace H. White* for Plaintiff, Appellee.

*Howe, Spencer & Cocke,* and *M. C. Mosley, (Robert P. Hunter,* of Counsel,) for Defendant, Appellant.

The opinion of the court was delivered by

Nicholls, C. J. The plaintiff, as widow of M. M. Marler and natural tutrix of the minor children, issue of their marriage, asks judgment against the defendant for damages for personal injuries received by the husband and father.

The prayer is based upon allegations that, on or about the 19th day of August, 1898, the said M. M. Marler, husband to the widow, and father to the children, boarded the evening (or cannon ball) train of the defendant company at New Orleans, La., as a passenger for Alexandria, Rapides Parish, Louisiana; that said train reached Alexandria about 3:45 A. M. on August, 20th, 1898; that M. M. Marler was taken beyond his destination without his knowledge or fault; that he attracted the attention of the conductor of said train to this fact immediately, or very soon after its departure from Alexandria; that

through the gross and criminal negligence of said company the train of said company was stopped at a point that rested the coach, in which Marler properly and legally was a passenger, about one hundred feet from the upper point of the first trestle beyond the first water tank above Alexandria; that the conductor of said train, at this point in Rapides Parish, ordered the said M. M. Marler to alight, which he did; that immediately upon stepping from the steps of the coach, he fell to the ground a distance of about fifteen or twenty feet, thereby sustaining injuries from which he died on or about August 23rd, 1898; that the said Marler was guilty of no contributory negligence whatsoever in the accident which befell him, but that his death was occasioned through the gross, careless, culpable and criminal negligence of the defendant company; that Marler was about 43 years of age, in good health, industrious, and the sole support of his wife and children, and that by his death they have been deprived of his support, companionship and protection, and have been damaged in the sum alleged.

In view of the premises, plaintiff prayed for citation on defendant; that there be judgment in favor of Mrs. Harriet C. Marler, widow, for the sum of ten thousand dollars, and Mrs. Harriet C. Marler, tutrix, for five thousand dollars for each of said minor children, with legal interest from judicial demand until paid, against the defendant, the Texas and Pacific Railway Company.

Defendant excepted that the District Court was without jurisdiction. That the domicile of this defendant was in the Parish of Orleans, Louisiana, where alone it could be sued upon such a cause of action as that set forth in plaintiff's petition.

The exception was overruled.

Under benefit of its exception, defendant answered.

After pleading the general issue, it expressly denied that the relation of passenger and carrier existed between the said M. M. Marler and itself at the time said injuries to said Marler occurred, but, on the contrary, it averred that if said relation ever existed, same had terminated before the happening of said injuries.

Defendant expressly denied that the said Marler's injuries resulted from any act, neglect or default on its part, or of any one for whose acts it was liable or legally responsible, but, on the contrary, it averred that if Marler suffered any injury, same resulted from,

Marler vs. Texas & Pacific R. R. Co.

or was contributed to, by his own act, neglect or default, and it expressly denied any liability or responsibility in the premises.

The case was tried before a jury, which returned the following verdict:

"We, the jury, find verdict for plaintiff against defendant for twenty thousand dollars for widow and children, as follows: Three thousand dollars for each child, and two thousand dollars to widow."

The court rendered judgment in conformity to the verdict after overruling a motion for a new trial filed by the defendant.

Defendant appealed.

### OPINION.

This suit is brought by the widow of M. M. Marler, in her own right and as tutrix of the minor children, issue of her marriage with her said husband, to recover damages from the defendant company, for the death of her husband averred to have been caused by the fault and negligence of its employees.

The evidence establishes that Marler took passage, at New Orleans, on the 19th of August, 1898, on a train of the defendant company, under a ticket purchased by him, from New Orleans to Alexandria; that he seated himself in one of the ordinary coaches of the train and remained therein, sleeping in his seat, almost continually, until after the train had reached Alexandria, had stopped there for twenty or twenty-five minutes, and had started west beyond that point; that before the train had reached Alexandria, and at about half a mile from that place, the conductor and also the porter notified the passengers in the coach in which Marler was seated that the next station was Alexandria; that the conductor woke Marler, told him that he was reaching Alexandria, and though the latter answered "all right," he none the less remained upon the train until after it had started; that a short distance west of Alexandria is a stream or bayou known as Bayou Rapides, which the defendant company's road approaches and crosses upon a bridge and trestle; that the railroad track is crossed a short distance beyond the west end of this trestle by a plantation road, and a little beyond this the track is crossed by that of the H. C. & N. Railroad, which, running out of Alexandria nearly parallel for a time with the Texas Pacific, also crosses Bayou Rapides and then converges towards and meets it as stated; that almost immediately after the train left Alexandria, the conductor started

through it to take up tickets, and went into the coach in which Marler was still seated and sleeping; that waking him he asked him if he intended going any further than Alexandria; that he replied that he was going to Alexandria; that the conductor told him that the train had left there and offered to take him to Boyce (the next station west) and send him back, but he answered that he wanted to go to Alexandria, and asked where the next stop would be; that he was told that it would be at the H. C. & N. crossing and was asked whether he knew where that place was; to which he replied that he did; that he would rather get off there and walk back, than to go to Boyce; that the train shortly after stopped and Marler got off; that this was between four and half-past four of the morning of Sunday, the 20th of August; and that a short time after five o'clock of that morning he was found, by a farmer named Samuel Ball, lying under the railroad trestle (dangerously injured) about eight-four feet from its west end, and that from this injury he died some days afterwards.

No one saw him fall, and the only testimony in the record bearing directly upon that subject are statements made by Marler to Ball, to S. W. Williams, who was his brother-in-law; to Dr. Simmons, to Judge Blackman, and to T. W. Squires, brought to our knowledge through the testimony of these parties.

The place at which the train stopped, when Marler alighted from it, is one of the disputed points in the case.

Plaintiff's attempt was to show that the train stopped so as to place the step of the coach, from which Marler alighted, directly over the trestle, while that of the defendant was to establish that it was some distance west of the west end of the trestle, and that Marler must have walked back to the trestle and attempted to cross it to return to Alexandria.

The testimony of Ball, Williams, Simmons, Blackman and Squires, as to the statements of Marler, went to the jury over objections from defendant, and under bills of exception.

The objections urged were that these declarations were made at a place other than where the accident occurred, and several hours after; that they constituted no part of the *res gestae;* that they were hearsay and incompetent either as part of the *res gestae,* or as dying declarations, or for any other purpose.

Plaintiffs maintain that the ruling of the court was correct; that the declarations of the deceased formed part of the *res gestae;* that to constitute them so it was not necessary that they should have been precisely concurrent with the act charged to have been committed; that it was only necessary that they should spring from it and be made under circumstances which preclude the idea of design.

They refer the court to State vs. Thomas, 30 Ann., 600; Augusta Factory vs. Barnes, 72 Ga., 217; Gillett's Indirect and Collateral Evidence, Sec. 258; Brownwell vs. Pacific R. R. Co., 47 Mo., 239; 46 Nebraska, 37; Irby vs. Shute, 25 Texas, 203; Ohio & Miss. R. R. Co. vs. Stein, 19 L. R. A., 733 (Ind.); Mitchum vs. State, 11 Ga., 615; Wharton Ev., Sec. 262; Harriman vs. Stowe, 57 Mo., 93; Travellers Ins. Co. vs. Mosby, 75 U. S., Wall., 397, 19 L. Ed.; Hall vs. State, 48 Ga., 607; Chill vs. H. & T. Com., 40 Atl., 1127; Handy vs. Johnson, 5 Md., 463; People vs. Vernon, 35 Cal., 49; 95 Am. Dec., 49; O'Connor vs. Chicago, M. & St. Paul R. R. Co., 27 Minn., 173; 38 Am. Rep., 288; International & G. N. R. vs. Anderson, 82 Texas, 516; Texas Pac. R. R. vs. Robertson, 82 Tex., 657; A. & E. Enc., Vol. 21, pages 101-102; State vs. Garrand, 5 Oregon, 216; S. R. Co. vs. Smith, 4 A. & E. E. R. C., 324, and 78 Texas, 421.

The defendant refers the court to State vs. Estoup, 39 Ann., 219; State vs. Melton, 37 Ann., 78; State vs. Williams, 34 Ann., 961; 1 Greenleaf, 14 Ed., Sec. 108; 1 Taylor, Secs. 525-527; Wharton Crim. Ev., 262-264, 691; Vicksburg & Meridian R. R. Co. vs. O'Brien, 119 U. S., 99 (1886); Boston & Albany R. R. Co. vs. Reilly, 158 U. S., 334; National Masonic Accident Association vs. Shryrock, 20 C. C. A. Repts., 3 (73 Fed. Rep., 774); Waldele vs. N. Y. Central R. R. Co., 95 N. Y., 295 (19 Am. & Eng. Cas., 400); Sullivan vs. Oregon R. Co., 23 Am. & Eng. R. R. Cases, 391 (Oregon Sup. Court, 1885); Williams vs. Bowden, 31 Tenn., 232; Savannah and Florida R. R. Co. vs. Holland, 41 Am. & Eng., 196 (Georgia Sup. Court, 1889); Mima Queen vs. Hepburn, 7 Cranch, 290.

Before passing upon this question, it is well that the declarations themselves, and the circumstances under which they were made, should be stated.

Marler must have fallen from the trestle between four and half-past four in the morning. The first person to see him was Samuel Ball, who was crossing Bayou Rapides on the H. C. & N. trestle, shortly after five o'clock, and was called by the injured man to his

assistance. His testimony (referring to his going to Marler when called) was as follows: "The first thing he (Marler) said to me was 'that the train put him off there last night, and he had fallen in the trestle. It was dark and he could not see, and he was almost dead.' He asked me if I knew Mr. Thorburn? I told him I did. He said one of his clerks was his brother-in-law, and asked me if I would go and tell him to come there quick." On cross-examination being asked "what was the first thing he said when you got to the place where he lay? Did you address him first?" he answered: "I asked him what was the matter? He told me that the train stopped and put him off there, and he said it was dark and 'I could not see and I fell off the trestle, and I am almost dead.' That was the first thing, and that was about all. He then asked me if I knew Mr. Thorburn. His mind seemed to be perfectly clear when I was talking to him. He gave me as intelligent an account as I think a man could."

Williams, the brother-in-law of Marler, testified that having been told by Ball that he had been injured, he went out to see Marler about 7 or 8 o'clock on Sunday morning. He said he found him lying on the left side of the bridge, about eighty feet from where the track went upon the earth works, and by the edge of the track; that he seemed to be in a kind of stupid condition—seemed to be very badly hurt; witness talked with him, only asking him a few questions, how the accident happened; what he said was in response to questions asked him; "that he told witness that he came up from New Orleans and was to get off at Alexandria; and he was asleep when he got to Alexandria, and just as the train was pulling out from Alexandria the conductor woke him up and asked him if he was to get off at Alexandia. He told him 'yes.' He said that he had his shoes off at the time; and he put his shoes on, and the conductor asked him if he wanted to get off there, or go to Boyce? He said 'put him off there,' and he would walk back to town. "He said he walked out and stepped off—it was very dark when he went off—going out in the light blinded him, and he did not know where he was stepping—thought he was stepping on the ground. He said: 'I walked out and stepped off.' Being asked whether he had said that Marler was in a semi-unconscious condition when he found him? he answered: "He seemed to be very badly hurt."

Marler was taken from the place where he fell to the depot at Alexandria, and Dr. Simmons was sent for to minister to him. He arrived about 11 o'clock on Sunday, and about the same time Judge Blackman and a friend also called to see him. Dr. Simmons testified that Marler was rational when he called on him—he was not talkalive. He was very calm and deliberate; his mind was in a condition to enable him to describe his case to him as he did; he was somewhat drowsy and stupid, suffering evidently from the shock of the fall; not sleeping or anything like that. Witness conversed with him, asked him how this accident happened in order to be able to tell how severe the injury was or what the nature of it was.

Judge Blackman and some other person, whom he did not remember, were present. Marler told him he had come up on the early morning train from New Orleans; that the trainmen failed to put him off at the depot; took him above town and put him off on a trestle; that he stepped off the steps of the train and fell from the steps down, and was there for some time, until passers by happened to find him there.

The following questions were propounded by plaintiff's counsel to the witness, and answers given as shown below:

Q. He told you, then, doctor, that he was a passenger from New Orleans, bound to Alexandria?

A. Yes, sir.

Q. And that the train carried him beyond his destination?

A. Yes, sir.

Q. Up above town, and the train stopped and put him off on the trestle?

A. Yes, sir.

Q. Did he tell you, doctor, why he did not get off at Alexandria?

A. He said he was asleep, and they failed to wake him up, and carried him past the town.

### CROSS-EXAMINATION.

Q. Did you first ask him as to how this accident occurred, or did he volunteer the information?

A. I asked him how it happened, I wanted to know how serious his injuries were.

Q. Were his replies to you characterized by lucidity and clearness?

A.  Yes, sir.

Q.  You say he was in perfect possession of his faculties at the time he made the statements to you?

A.  Well, he was enough so to answer the questions I put to him.

Q.  Did he state to you that he was carried past Alexandria by the train on which he was?

A.  Yes, sir.

Q.  That the employees failed to put him off?

A.  Yes, sir.

Q.  Now, what did he say about the circumstances of his leaving that coach?  Did he say he made a step and fell?

A.  He said he stepped directly from the train and went off.

Q.  Did he say he stepped directly from the train down, or stepped on the trestle and then fell?

A.  I do not know that; could not say; can not be certain about that.  He said, in stepping off the train, he went down.

## RE-DIRECT EXAMINATION.

Q.  He may have told you, doctor, that he stepped on the trestle, and then off?

A.  He may have, sir; I did not attach much importance to that.

Q.  You were paying no attention to the legal aspect of it?

A.  No, sir.

Judge Blackman testified that he had called on Marler at the depot; that he was awake; he asked him about how the accident occurred; in answer, his recollection was, that Marler stated that he left New Orleans on the morning train, reached Alexandria and was asleep, passed by the depot, did not awake, and that they did not awaken him; when he woke up the conductor asked him if he wanted to go to Boyce?  He said "no;" he wanted to get off at Alexandria; that the conductor stopped the train just above Bayou Rapides (witness could not tell where), near the trestle works was witness' recollection, on it or near it (he could not say positively which), and asked him to get off there.  He said he stepped down (witness' recollection that it was on a sill or something), and stepped off the steps. He took one step and said he went over, went through or fell through, or down by the side of it (witness could not swear positively which). He, witness, remembered distinctly hearing him say he got off on a

sill; took a step and went over. He said he was internally injured, and was feeling pretty badly; he said he was unable to get up; he did not state anything about being found .there. He said he took this one step. He did not give any further account of his actions, such as getting up and going anywhere after his fall.

· On cross-examination he answered that his recollection was that Marler's statement was given in answer to witness' questions as to how he had got hurt; that from the way he talked, he seemed to know what he was talking about. Witness did not hear the word "cap" mentioned; his recollection was that Marler said he stepped right on that sill and as the train passed, he took one step and went down or over—just took one step from the sill and went down.

Marler was taken from Alexandria to Forest Hill, a place some twenty miles away from that place, though just where is not. stated. S. W. Squires, a blacksmith, living at Forest Hill, testified that he saw him a few hours after his arrival there, about 5 o'clock in the afternoon on Sunday, and conversed with him.

Witness asked him how the accident happened, and he told him. He told him he stepped on the end of the tie—that he got on one end of the tie—took one step and then went on the ground. His mind was perfectly clear when he made these statements. Talked very little about his business, said he was afraid he was going to leave his family in a very bad condition. Witness saw him the same evening. He told witness he thought his internal injuries were serious, and he did not think he would get over it. After ·this he had several conversations with him, and he talked about the accident to him; he frequently ·told witness he could not live, he did not think he was going to live, he could not stand it.

As to the accident, Marler told him they stopped the train on the bridge; that he stepped one foot off the step and the other on the tie, and the next step he made he went over. He said he laid there for a time, and didn't know anything, and when he came to himself he was then helpless, and stayed there from that time until near 8 o'clock. He said a negro came by and he tried to get the negro to assist him, but he wouldn't do it; he told him that he got on the train at New Orleans, bound for Alexandria; that he was asleep at Alexandria, and they failed to wake him up, and took him past Alexandria; that they stopped the train and put him off on the bridge; that he stepped from. the car on to the tie and that the next step he made was on to

the ground; that it was very dark, and he did not know anything, supposed he was stepping on land from the ties.

The general rule of evidence is that testimony must be given on oath by persons speaking to matters within their own knowledge, and liable to be tested by cross-examination. (Gillett Indirect Evidence, Section 224).

To this rule there are recognized exceptions, but in the application of the same to particular cases, great care, caution and strictness, should be exercised.

Among such recognized exceptions are declarations unsworn to by the parties making them, which fall under the operation of the principles of the *res gestae.*

The great difference in the decisions of the courts upon this latter subject makes it difficult to ascertain and fix with certainty its exact legal scope simply from precedents. Much of the embarrassment and confusion of the law in this matter, resulting from these differing cases, is due, as stated by the Supreme Court of Oregon in Sullivan vs. Oregon, R. Co. (Supreme Court of Oregon, 1886), to the attempts which have been made to stretch the *res gestae* doctrine to an unreasonable extent in order to suit some supposed meritorious case.

The admissibility of unsworn declarations in evidence, as part of the *res gestae,* does not rest upon the theory that there is a great probability that they may be true, for though these declarations are frequently made under such circumstances as to entitle them to implicit confidence, yet they do not answer the requirements of the law: that testimony against a party shall be given under the test and sanction of a solemn oath, and that he should have had an opportunity of cross-examination (Wadile vs. New York Central R. R., 95 N. Y., 295).

Were we to permit ourselves to be guided in this matter, simply by the high character of the parties making the declarations, and of those testifying to the fact of such declarations, and to the substance of the same, we would test the "admissibility" of evidence by the credibility of witnesses instead of by fixed rules determinative not only of that particular, but of all other identical cases.

A leading case bearing upon the subject of *res gestae* is that of Tillson vs. Terwinger (56 N. Y., 273). Folger, J., in that case, said: "To be a part of the *res gestae* the declarations must be made at the time of the act done, which they are supposed to characterize. They

must be calculated to unfold the nature and quality of the acts which they are intended to explain."

"They must so harmonize with these facts as to form one transaction. There must be a transaction of which they are considered a part. They must be concomitant with the principal act, and so connected as to be regarded as the result and consequence if co-existing."

Gillet, in Section 246 of his work, declares that, "particularly, in actions involving injuries to the person, it will be found that the *res gestae* is so clearly tied down to the principal act that the element of time may be said to control in a large measure."

The Supreme Court of Tennessee, in Williams vs. Bowden (1 Swan, 282), declared: "The declarations are evidence because they are a part of the thing doing; therefore when the thing shall have been done and concluded declarations then made are not evidence."

In addition to the rule stated of the necessity of the declarations being concomitant in time with the principal act it has been stated to be an important though not necessarily a controlling circumstance connected with the declarations that they should have been made at the place of occurrence of the principal act (Prideaux vs. City of Mineral Point, 43 Wis., 513; Mutcha vs. Pierce, 49 Wis., 231). The time of the occurrence of the principal act is sometimes, by reason of some special circumstance, extended forward so as to make it coincident and connected with subsequent declarations touching the same by a constructive continuity of time, as for instance when the party making the declaration having become unconscious at the very moment of the occurrence of the principal act, the declarations are made by him at the very moment of his regaining consciousness. Under such conditions the act and the declarations are sometimes held to be simultaneous by "relation," the declarations being spontaneous.

On the same principle an act occurring at a particular time has been permitted, sometimes, to be connected with after declarations relative thereto as being of successive acts and constituting one single continuing transaction.

In Mayes vs. State, 63 Miss., 329, the court said: "That hearsay testimony can not be given, is universally admitted by ythe courts, which have from time to time been called on to determine whether statements of this character are competent, and they have, without

exception, declared that when the statement assumes the character of a narrative of a past transaction it is incompetent."

"But in many cases what were manifestly completed and finished acts have been by a sort of construction treated as incomplete and unfinished, and the statement thus held to be a verbal act incorporated with and a part of the thing done. * * * It is not enough that the statement will throw light upon the transaction under investigation, or that it was made so soon after the occurrence as to exclude the presumption that it has been fabricated, or that it was made under such circumstances as to compel the conviction of its truth. The true inquiry, according to all the writers, is whether the declaration is a verbal act illustrating, explaining or interpreting other parts of the transaction, of which it is itself a part, or is merely a history or part of a history of a complete past affair. In the one case it is competent, in the other it is not. We are not to be understood as attempting to lay down any rule for what, under all circumstances, is the limit of the existence of the principal fact, which may be explained by contemporaneous declarations."

"In some cases the *res gestae* may extend over weeks or months, in others they are limited to hours or to minutes, or to seconds."

In Bradley vs. State, 22 Texas, App., 273, it was said the test of *res gestae* was: "Were the facts talking through the party, or the party talking about the facts?"

In Gillett's Indirect Collateral Evidence, Section 292, the author says that he had been at some pains to show in the preceding chapters of his book that the *res gestae* did not rest upon the low plane of hearsay evidence, because of its connection with and consequent credit from the principal fact. That, reasoning from that postulate, it would seem to be an incontrovertible proposition that the fact under inquiry must always be established by direct evidence, except possibly in that class of subjective inquiries where the ascertainment of mental condition is the end sought. (Citing White vs. Rayburn, 11 Oregon, 250).

The facts in Waldele vs. New York Central R. R., 95 N. Y., 274, were that about midnight a freight train passed a street crossing on defendant's road, followed fifty feet distant by an engine going backward.

Shortly after, plaintiff's intestate was found near the track fatally wounded. He was removed to the sidewalk, and afterwards to a

hospital, where he died three hours after. About thirty minutes after the accident, the deceased made a statement, as to the cause of his injury, to his brother, who was offered as a witness to prove it.

The court said: "The *res gestae*, generally speaking, was the accident. These declarations were no part of that; were not made at the same time, nor so nearly contemporaneously with it as to characterize it, or throw any light upon it. They are narrative, giving an account of a transaction, not partly past, but wholly past and completed. They depend wholly upon the accuracy and reliability of the deceased and the veracity of the witness who testified to them. Nothing was then transpiring or evident to any witness which could confirm the declaration, or by which, upon cross-examination of the witness testifying, or by examination of other witnesses, the truth of the declaration could be tested."

In Sullivan vs. Oregon R. Co. (Oregon Sup. Court, 1886), plaintiff claimed to have been ejected by a conductor from a moving train. Witnesses were offered to prove his declarations, made two or three minutes after the train had passed, to the effect that the conductor had pushed him off. The court said: "The affair, whatever it was, occurred on board the train of cars. Everything that transpired between the conductor and the respondent took place there and ended there fully and completely when he was pushed off or jumped off. When the respondent went from the cars to the ground, and the train had passed on, the transaction between him and the conductor was as effectually terminated as it was a month later."

"How can this statement be claimed to be a part of the transaction between the respondent and the conductor, when the affair was at an end and the latter party probably a mile away at the time? I am unable to endorse such view."

"The statement of the respondent, at the time referred to, as to how he came off the cars is as undoubtedly hearsay evidence as any narration of the affair he has given since that time."

In Savannah & Florida R. R. Co. vs. Holland (Georgia Sup. Court, 1889), the plaintiff being a passenger on defendant's train was carried past his station. The question in the case was, whether he alighted safely and received his injury afterwards by falling through a trestle on his way back to the station, or whether he fell through the trestle by being forced, or pushed off by the conductor. Certain declarations of the plaintiff as to his manner of leaving the train were

allowed to be introduced, which were made after the plaintiff had bound up his broken limb and cried for help to a person who came to his assistance.

The court said: "It is manifest that the act by which the plaintiff was injured had completely terminated before his declarations were made, and that they were no accompaniment of the same. Were they so connected with it in time as to be free from all device or after thought?

"He had turned his attention from the act to measures looking to his own safety and comfort. He had certainly occupied his thoughts with something besides the facts and circumstances to which his declarations related. He had full opportunity (although no doubt under great suffering) to devise a story in his own interest, and there is no reason for concluding that he did not have capacity to take advantage of his opportunity. He was exposed to the temptation of fabricating a story if he needed the aid of invention, and the exposure was under circumstances calculated to excite suspicion that his statement was, or might have been, referable to deliberation and afterthought, rather than to spontaneous or instinctive utterance. This does not imply that he did fabricate, for he might not have done so. Truth may have been with him and invention unnecessary. But as his declarations did not accompany the act, they had to be so nearly connected therewith in time as to be free from all suspicions of device or afterthought (Hall vs. State, 48 Ga., 607). If subject to suspicions at all, they were not admissible, although in the particular case the suspicion might be erroneous."

In a Michigan case (Merkle, Admr. vs. Township of Bennington, 58 Mich, 156) where the plaintiff narrated the circumstances of his injury after he was removed to a house twenty or thirty rods away from the place of accident, Cooley, J., said: "The affair was all over when Merkle was taken to Mrs. Cook's; he had been removed from the scene of the injury; the surroundings were all changed; the time for exclamation or outcry was past, and nothing for the present remained to be done, but to care for the wounded man, leaving investigation into the cause of injury to some more favorable time in the future. The statements made by Merkle, to his physician, were proper enough as between man and man, but they had no legal value and were, therefore, improperly admitted."

Counsel of defendant, in their brief, very correctly say: "The *res gestae* here was the manner and circumstances under which, and the place where, the deceased left the train. His declarations relative thereto were made after the transaction was an accomplished fact; after the conductor and his train were miles away, and in the presence of no person who was an actor in the transaction; they were made in every case not spontaneous and instinctively under stress of the *res gestae,* but deliberately (though, doubtless, under great suffering), and in narrative form in response to inquiries how the accident had happened, and after the deceased had turned his attention to measures of safety, evidenced by his calling for help. Furthermore, three of the statements which were most important and explicit were made at places other than the place of accident."

The declarations of Marler, to the physician, are specially pressed upon us as being sustained by authority, but we do not think they stand on any better ground than the others. It is possible that the statement made by Marler to Dr. Simmons, that he had fallen from the trestle, might have been properly elicited from the latter as *rem ipsam,* as furnishing part of the data upon which the physician reached a conclusion as to the nature and character of the injuries received, but the injured man was not called upon to state to him for that purpose, nor was it at all relevant for the physician to know anything about the facts and circumstances under which he left the cars, and particularly the place where he left the cars (for this latter fact was the principal fact involved in the case), and those under which he went upon the trestle.

Those recitals would have been very important and pertinent in a statement to an attorney, but not to a physician, and the physician in this case very frankly states that he did not pay much attention to them; he was considering the case from a medical, and not a legal, aspect.

Gillett, in Section 265 of the work already quoted from, says: "Statements as to how the injury was received, whether made to a professional man or not, are self-serving in their character, and can never be shown in evidence in support of the party claiming them. Such declarations, at the best, are hearsay." We do not think that the statements made by Marler, at Forest Hill, to Squires, stand on a different plane from those made to the other parties, by reason of the fact that at the time they were made he might have been conscious of

approaching death. They were not sought to be introduced as dying declarations, and they would not have been admissible as such had they been so offered.

The circumstances under which dying declarations are made, with a view to testimony in criminal cases, differ greatly from those where they are made with reference to future civil proceedings for damages occasioned by the injury. In the one case, the party making the declaration has no personal interest in making a false statement, and would be actuated in doing so only by hatred or malice, while in the other, relief for the family he is leaving behind him might furnish a strong motive for giving a wrong version of the facts of the occurrence.

What we are here saying has no reference whatever to the facts of this particular case. This matter has to be regulated by general rules, not to be departed from in individual cases. The fact that declarations should have been made under a belief of the party's approaching death, merely adds to the probability of their being truthful, and we have seen that the doctrine of *res gestae* is not based on that fact.

The court erred in permitting the declarations of Marler, made to Ball, to Williams, to Dr. Simmons, to Blackman and to Squires, to be received in evidence, and we can not consider them.

Eliminating these declarations, plaintiff's demand rests upon the testimony of Nelson Ball and Theodore Ball. Nelson Ball's testimony, as he himself declared was purely a guess as to the place where the train stopped and Marler alighted from it. Theodore Ball is a boy of about twelve years of age. He is evidently very bright, frank, truthful and thoroughly sincere. The weakness of his testimony results from the fact that viewing things at night, and from the distance, which he did, it was utterly impossible for him to state with the accuracy and certainty, which the occasion called for, the position of defendants' train at the time it stopped and Marler left it. He was sleeping in a house over five hundred yards from the place at which he located the train as stopping, and judged of its position in the darkness of the night simply by the lights upon it. Opposed to his ideas as to where the train stopped, is the positive testimony of D'Hemecourt, the conductor; Landry, the porter; Beeler, the fireman; Covington, the engineer, and Virges, a newsboy, who were all

on the train directly at the spot, and their testimony is corroborated by that of Park, a passenger, seated in the same coach which Marler left.

These parties, though they differ from each other in some matters not material, all concur in showing that Marler stepped upon firm ground when he left the car; that the train stopped but once between Alexandria and Boyce, and that this was near the Houston Central crossing, and though probably somewhat further to the east from that crossing than the train usually stopped (it having stopped near the plantation road referred to in the testimony), yet sufficiently far to the west to cause its rear end to clear the west end of the trestle by some distance.

The length which this opinion has reached precludes our giving the testimony in full: suffice it to say that unless these witnesses were unworthy of belief, it has been affirmatively shown that Marler did not leave the car at or upon the trestle, but some distance to the west of it.

There was no attempt on the part of the plaintiff to impeach the credibility of any of the witnesses other than the porter, Landry, and as to him we find nothing which would warrant our supposing him to be untruthful.

The allegations of plaintiff's petition, that the conductor ordered Marler to alight at the point he did, would convey the idea that he was ejected from the car.

This is utterly unwarranted. He elected to get off at the first stop made by the train after it left Alexandria instead of accepting the offer to be taken to Boyce and back without expense.

He was told where the train would stop—said he knew the place and that he would walk back to Alexandria.

There does not seem to have been the slightest friction between the conductor and Marler, or any thought at any time of ejecting the latter.

It is claimed in plaintiff's brief that Marler was evidently suffering from mental or physical disability on the train, and when he left it, and that even if he got off at the Houston Road crossing, defendant would still be liable in damages for his death in not having warned him, when he left the car, that he would have to cross a dangerous trestle in returning to Alexandria.

It is not alleged in the petition that Marler was suffering from any mental or physical disability on the train, and there is nothing in the evidence tending in that direction beyond the fact of his sleeping on the train.

The case was tried upon the pleadings and on the theory that the train was stopped over the trestle, and Marler fell through it directly on stepping from the step of the car.

The evidence was taken on both sides with reference to that issue. With Marler's declarations excluded there was no evidence in the case which could have warranted the jury's verdict. We have no alternative but to set the verdict aside and annul the judgment. For the reasons assigned, it is hereby ordered, adjudged and decreed, that the verdict of the jury be set aside, and that the judgment of the District Court, appealed from, be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that plaintiff's demand be rejected and her suit dismissed.

Rehearing refused.